1 | MICHAEL C. ORMSBY
United States Attorney
2 | Eastern District of Washington
Aine Ahmed
3 | Assistant United States Attorney
Scott T. Jones
4 | Assistant United States Attorney
Post Office Box 1494
5 | Spokane, WA 99210-1494
6 | Telephone: (509) 353-2767
7

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 2 5 2015

SEAN F. McAVOY, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

8
9

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

10 | UNITED STATES OF AMERICA,

11 |                          Plaintiff,

12 |            vs.

13 |

14 | JAMES TERRY HENRIKSON,

15 |                          Defendant.

14-CR-124-SMJ-1

Plea Agreement

Fed. R. Crim. P. 11(c)(1)(C)

16
17        Plaintiff, United States of America, by and through Michael C. Ormsby, United

18 States Attorney, for the Eastern District of Washington, and Aine Ahmed and Scott T.

19 Jones, Assistant United States Attorneys for the Eastern District of Washington, and

20 Defendant JAMES TERRY HENRIKSON and the Defendant's counsel, Mr. Mark

21 Vovos and Mr. Todd Jeffrey Maybrown, agree to the following Plea Agreement:

22        1.    Guilty Pleas and Maximum Statutory Penalties:

23        The Defendant, JAMES TERRY HENRIKSON, agrees to plead guilty to

24 Counts 1 and 2 of the Indictment filed on September 16, 2014, charging the Defendant

25 with Murder-for-Hire with a murder in fact being committed, in violation of 18 U.S.C.

26 § 1958.

27        The Defendant, JAMES TERRY HENRIKSON, understands that Counts 1 and

28 2 are each Class A felonies, and that the maximum penalty as to **each** count is life

Plea Agreement - 1
P50925dd.AAA

imprisonment; a fine not to exceed $250,000; not more than a life term of supervised release; restitution, a $100 special penalty assessment.

The Defendant, JAMES TERRY HENRIKSON, understands that a violation of a condition of supervised release as any count carries an additional penalty of re-imprisonment for all or part of the term of supervised release without credit for time previously served on post-release supervision.

2.    <u>The Court is Not a Party to the Agreement</u>:

The Defendant understands that notwithstanding the 11(c)(1)(C) nature of this Plea Agreement, the Court is not a party to this Plea Agreement and may accept or reject this Plea Agreement. Sentencing is a matter that is solely within the discretion of the Court. The Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by the Defendant; that the Court will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in this Plea Agreement.

The Defendant acknowledges that no promises of any type have been made to the Defendant with respect to the sentence the Court will impose in this matter. However, the Defendant also understands that this Plea Agreement is entered pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant further understands that the Defendant will have the option to withdraw from this Plea Agreement if the Court imposes a harsher sentence than agreed upon.

3.    <u>Waiver of Constitutional Rights</u>:

The Defendant, JAMES TERRY HENRIKSON, understands that by entering these pleas of guilty the Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

(a).    The right to a jury trial;

(b).    The right to see, hear and question the witnesses;

(c).    The right to remain silent at trial;

Plea Agreement - 2
P50925dd.AAA

        (d).    The right to testify at trial; and

        (e).    The right to compel witnesses to testify.

While the Defendant is waiving certain constitutional rights, the Defendant understands the Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if the Defendant cannot afford to hire an attorney. The Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

    4.   <u>Elements of the Offense</u>:

The United States and the Defendant agree that in order to convict the Defendant of Count 1 or Count 2, in violation of 18 U.S.C. § 1958 (Murder for Hire) , the United States would have to prove beyond a reasonable doubt the following elements:

        (a).    First, on or about January 15, 2012 and continuing until on or about February 22, 2012 (Count 1) and again, beginning on or about October 1, 2013 and continuing until on or about December 15, 2013 (Count 2), in the Eastern District of Washington, and elsewhere, the Defendant traveled or caused someone else to travel interstate (or used or caused someone else to use an interstate facility such as a cellular phone) to facilitate or further the commission of a murder. The commission of a murder need not have been the only reason, or even the principal reason, for the interstate travel (or use of an interstate facility) as long as it was one of the reasons for the travel or use of a facility;

        (b).    Second, the travel or use of an interstate facility was done with the intent that a murder be committed in violation of the laws of any State or the United States. It is the intent of the Defendant that matters, not that of the third person who travels or uses the interstate facilities at the behest of the Defendant;

(c).    Third, the murder in question was intended to be committed as consideration for the receipt of anything of value. This requires a mutual agreement, understanding or promise that something of value would be exchanged for committing the murder.  "Anything of value" means money, negotiable instruments, or anything else the primary significance of which is economic advantage; and

(d).    But for the Defendant's actions, the victims, Kristopher Clarke and Douglas Carlile, would not have died.

5.    Factual Basis and Statement of Facts:

The United States and the Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for JAMES TERRY HENRIKSON's guilty pleas.  This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

A.    INTRODUCTION:

As further detailed below, Kristopher Clarke  ("KC") was murdered on or about February 22, 2012, at the request of the Defendant James Terry Henrikson ("Henrikson').  Timothy Suckow ("Suckow") committed the murder in exchange for $20,000. Clarke was murdered in North Dakota, and Suckow traveled from Spokane, Washington, to North Dakota.  Prior to this travel, the Defendant had formed the intent to murder Steven Kelly and/or Kristopher Clarke.  Robert Delao ("Delao"), who at the time of Clarke's murder was an associate of Henrikson, at the request of Henrikson, used a cellular telephone to contact Suckow and make arrangements for Suckow to come to North Dakota.  Henrikson paid the $20,000 in two separate installments of $10,000 and directly paid Suckow in exchange for committing the

1  murder of Kristopher Clarke.  As further detailed below, Henrikson had Suckow travel
2  from Washington to North Dakota with the intent to murder Clarke.
3      Douglas Carlile ("Carlile") was murdered on December 15, 2013, by Suckow in
4  Spokane, Washington.  Henrikson, then in North Dakota, used a facility of interstate
5  commerce to order Delao to contact Suckow to commit the murder.  Delao again used
6  a cellular telephone to contact Suckow.  Suckow was to be paid $20,000 for the
7  Carlile murder, but was arrested the day before he was to receive payment.  Delao was
8  planning on meeting with Suckow to make the payment.
9      B.      K.C. CLARKE MURDER:
10     Robert Delao first met Henrikson at a gym where they both worked out.  Delao
11  and Henrikson crossed paths again when they were both in the Benton County Jail.
12  Henrikson told Delao to look him (Henrikson) up when he (Delao) got out of prison to
13  get a job.  After being released from Federal Prison, Delao was able to get in contact
14  with Henrikson through Henrikson's ex-wife.
15     When Delao first made contact with Henrikson in December, 2011, Henrikson
16  told him that he had started a trucking company in North Dakota.  Henrikson stated
17  that he was having trouble with a business rival and asked Delao if he knew anyone
18  that would be willing to come up to North Dakota and assault this individual.  Delao
19  responded that he would try to find someone to help Henrikson commit the assault.
20  Delao did this because he wanted to acquire a legitimate job from Henrikson in North
21  Dakota.
22     Delao contacted his long-time friend Lazaro Tomas Pesina about any contacts
23  that he may know who would go to North Dakota and hurt someone.  Pesina
24  recommended Suckow. Delao and Suckow knew each other from working together at
25  IRS Environmental in 2007.  IRS Environmental is located in Spokane, Washington,
26  and is in the business of asbestos and insulation removal.
27     Pesina contacted Suckow and informed him that Delao was looking for
28  someone to go to North Dakota to beat someone up in exchange for money.  Suckow

Plea Agreement - 5
P50925dd.AAA

then met Delao at his house to discuss the possibility of going to North Dakota. Delao informed Suckow that a friend of his needed someone beat up in North Dakota. Delao told Suckow that the job was being requested by Henrikson, and that he would probably be paid a couple of thousand dollars for it. While at Delao's residence, Suckow spoke with Henrikson on the phone. According to Suckow, their conversation was general in nature, and Suckow just said that he had heard from Delao that Henrikson needed a "big brother" to get do some work in North Dakota, and Henrikson said that he did.

Suckow took a train to North Dakota on February 21, 2012. Telephone analysis indicates that Suckow was in North Dakota from February 21, 2012 to February 23, 2012. After Suckow arrived, he and Henrikson went to a restaurant. While there, Henrikson talked about the target. The target to be assaulted at the time was a man named Steve Kelly, who, according to Suckow, was operating a rival trucking company. Suckow was told that the Reservation required that that a trucking firm be owned by an Indian to operate on the Reservation. During their conversation, Henrikson asked if Suckow would be willing to kill Kelly.

After eating, Henrikson took Suckow to Watford City, North Dakota, where Henrikson leased three or four cabins and Suckow spent the night in one of the cabins.

On February 22, 2012, Henrikson came to the cabin to pick Suckow up early in the morning. Henrikson informed him that he was angry at one of the guys that he had working for him. Henrikson told Suckow that his employee's name was Kristopher Clarke, and that Clarke intended on working for a competing trucking firm, and that he intended to take some of Henrikson's current customers with him. Henrikson then took Suckow out for breakfast. Henrikson's then-wife, Sarah Creveling, went to breakfast with them. While at breakfast, another employee of Henrikson's named Justin Beeson observed Suckow with Henrikson and Creveling.

After breakfast, Henrikson and Creveling dropped Suckow back at the cabin. Henrikson informed Suckow that he would be back to pick him up after he dropped

Plea Agreement - 6
P50925dd.AAA

1  off Creveling at the Henrikson's Shop (Shop). After dropping off Creveling,

2  Henrikson returned to pick up Suckow. While they were driving to the Shop,

3  Henrikson asked Suckow to kill Clarke. At first, Suckow did not think Henrikson was

4  serious.

5     Henrikson had the intent to kill Clarke when he summoned Suckow to North

6  Dakota. Approximately seven to ten days prior to February 22, 2012, Henrikson

7  called an impromptu meeting with all of his employees, to include Clarke. The main

8  purpose of this meeting was for Henrikson to inform Clarke that Clarke needed to take

9  a vacation. Henrikson insisted that Clarke take a two-week vacation because

10 Henrikson said Clarke was burning himself out. Henrikson was also adamant that

11 Clarke take the vacation as soon as possible. Witnesses said that this meeting was

12 unusual and not a normal occurrence. Prior to Suckow arriving in North Dakota,

13 Henrikson informed his employee George Dennis, that he was "going to kick the shit

14 out of KC." Henrikson had informed several of his employees, including George

15 Dennis and Justin Beeson, that he (Henrikson) was very upset at Clarke because

16 Clarke intended to leave Henrikson's company and work for another company.

17 Henrikson informed these employees that KC Clarke intended to steal truckers that

18 worked for Henrikson, and planned to take these truckers with him to another trucking

19 company. Henrikson also formed the intent to murder Steve Kelly, and had informed

20 many individuals that he was very upset at Kelly for disrupting his business when

21 Kelly reported him to the MHA Tribe for not having a valid TERO card. This caused

22 Henrikson to lose a major hauling contract.

23    Continuing on February 22, 2012, Henrikson took Suckow to his place of

24 business (trucking firm) and began introducing him to various employees. This Shop

25 is located on the MHA Nations Indian Reservation in Fort Berthold, ND. Suckow

26 was hesitant about being introduced to people, given the nature of his assignment.

27 This was the first day George Dennis met Suckow. Both Dennis and Justin Beeson

28 were employed as truck drivers and worked for Henrikson. Henrikson informed

Plea Agreement - 7
P50925dd.AAA

Beeson that he was going to kill Clarke. Beeson thought Henrikson was joking. Henrikson told his wife, Sarah Creveling, to contact Clarke and tell Clarke to turn in his company credit card before he went on vacation. Various witnesses, including Beeson and Dennis, observed Henrikson attempting to contact Clarke. During this time period, Suckow went to the garage area of the Shop. Ryan Olness, another employee, saw Suckow in the Shop.

According to Suckow, he and Henrikson proceeded to a shop portion of the building. In the shop there was a bay to work on trucks and also a bathroom and shower connected to it. Henrikson told Suckow that he could choke Clarke, but Suckow said that he was afraid that he did not have the strength to choke Clarke to death. Henrikson then told Suckow that Clarke sometimes carried a gun, and that perhaps it would be better if Suckow could hit Clarke with something. Suckow saw some floor jacks with handles sitting on the floor. Suckow picked up one of the handles and placed it near the door. Henrikson informed Suckow that he would bring Clarke into the shop under the pretense that Henrikson wanted to show him something. Dennis and Beeson, who were standing outside, witnessed Henrikson summoning Clarke to the shop area.

Suckow said that when Henrikson brought Clarke into the shop, Henrikson introduced Suckow to Clarke and Suckow shook Clarke's hand. There was a motorcycle in the garage, and Henrikson took Clarke towards the motorcycle under the pretense that he wanted to show him something. At that point, as Clarke turned his back to Suckow, Suckow approached Clarke and hit him in the head with the metal handle. Suckow hit Clarke approximately four times in the head with the metal handle, until the last hit crushed his skull (Suckow stated that Clarke's head got soft with the last hit). Suckow stated that Clarke was profusely bleeding. Henrikson became concerned about the amount of blood on the floor, and so Suckow grabbed a garbage bag from the trash can, emptied its contents, and wrapped the bag around Clarke's head. Suckow then lifted Clarke's body and placed it into the adjacent

Plea Agreement - 8

1   bathroom.  Henrikson them locked the bathroom door with a key.  Henrikson
2   remarked that there was a lot of blood on the floor, and that they had to clean it up.
3   Suckow grabbed some rags and began cleaning up the floor.
4           Suckow told Henrikson that he needed to keep people away from the shop, and
5   that he needed to make sure that the doors were locked.  Henrikson told Suckow to
6   keep cleaning up the blood and that he would be right back.  Henrikson left the shop
7   and came back and forth on several occasions while Suckow continued to clean the
8   floor.  Henrikson then ordered George Dennis and Justin Beeson to stand guard
9   outside the shop, and to not let anyone inside.  Henrikson also ordered Beeson to
10  collect all the keys to the shop from the other employees. Suckow was worried that the
11  blood had drained into the cracks of the concrete, and was working very hard to clean
12  the blood off the floor.  Henrikson informed Suckow that he had two guys guarding
13  the door so that no one would come in.  Suckow asked Henrikson who these people
14  were, and whether they could be trusted.  Henrikson stated that Justin (Justin Beeson)
15  and George (George Dennis) were guarding the door and that they could be trusted.
16  According to Dennis, Henrikson told Dennis to stand guard in front of the door and
17  not let anybody into the shop. Beeson also said that he was instructed not to let anyone
18  into the shop and Henrikson also instructed him to gather up all of the employee's
19  keys to the shop.
20          Suckow stated that he worked on cleaning the floor for quite some time, for
21  perhaps an hour, and used bleach, oil, and whatever else he could find in the shop to
22  clean the floor.  Suckow took the pipe he used to hit Clarke, cleaned it, and placed it
23  back on the jack.
24          Suckow stated that Henrikson was beginning to act frantic, and stated that one
25  of Clarke's friends had telephoned and said he was on the way out to the shop to see
26  Clarke.  This was Rick Arey.  Because of this, Henrikson said that they needed to
27  immediately get rid of Clarke's truck, which was parked outside.
28

Plea Agreement - 9
P50925dd.AAA

At that point, Henrikson told Suckow that he (Henrikson) would get a ride with George Dennis, and that Suckow would drive Clarke's truck into Watford City and drop it off.   Suckow parked Clarke's truck on a back street in Watford City, and George Dennis and Henrikson picked him up.   Based on cell-site analysis and phone contacts during this time frame, Suckow and Henrikson were both in the Watford area with multiple contacts with one another.  Further analysis corroborates that Henrikson traveled to Watford immediately followed by KC Clarke (While Clarke was already dead, his phone was in the center console of his vehicle and was not discovered until later by Suckow).

After returning to the Shop, Suckow continued to clean the floor.  Arey arrived at the Shop and spoke to both Henrikson and Creveling. They both told him that Clarke had left. Henrikson also told him that "KC went to see his grandfather.  You know KC, he disappears sometimes."  Arey found this to be unusual, as he and Clarke had a business meeting that afternoon, and both Arey and Clarke had already decided to leave Henrikson's employment.  Arey later went to Clarke's residence and noticed that Clarke's toothbrush, cell charger, clothes, tools, and other personal effects were still in the house.  Arey distinctly remembers all of Clarke's shirts hanging in the closet.

Henrikson informed Suckow that they need to move Clarke from the Shop. Suckow grabbed a box which previously contained a toilet.  Both Suckow and Henrikson grabbed Clarke from the bathroom and placed him into the box.  Suckow used some masking tape to shut the box.

Dennis observed Suckow exit the shop, and noticed that Suckow had what appeared to be blood on his pants. Dennis stated that when Suckow exited the shop, he looked right at Dennis and stated "I know who you are."  Henrikson then went outside and directed George Dennis to back his truck up to the door.  Both Henrikson and Suckow picked up the box containing Clarke's body, and placed it in the back of the truck.

Plea Agreement - 10

P50925dd.AAA

Suckow made sure there was a shovel in the back of the truck (Dennis, however, remembers stopping at a hardware shop to buy shovels). As they were loading the box containing Clarke's body in the truck, several truckers came up and talked to Henrikson about work schedules, and Henrikson spoke with them before getting in the truck with Dennis and Suckow.

Dennis, who was driving, then asked where they were going, and Henrikson then told Dennis to drive towards Watford City. On the way, Suckow turned his phone off, and Henrikson dropped his phone on the side of the road. Suckow said Henrikson did this because he could not pull the battery out of his phone. Suckow said that they did this so that they would not be pinged to the location where they would bury Clarke. The three eventually went to the Badlands State Park. As they entered a turnaround, Henrikson exited the vehicle and removed the gate. After Dennis' truck entered, Henrikson closed the gate behind them. They drove about half a mile, and parked near a ravine. After getting out of the truck, Suckow and Henrikson walked to a spot near a tree. Suckow then began digging. Dennis remained in the truck and slept (or pretended to sleep). Dennis and Suckow independently identified to law enforcement the same turnaround that they took to bury Clarke's body. While Dennis did not accompany Suckow and Henrikson to bury the body, George Dennis' identification of the area corroborates Suckow's version of the events.

Suckow dug a hole approximately five feet deep and approximately three feet wide. Suckow had a tarp which he had taken from Dennis' vehicle to put the shoveled dirt on. While Suckow was standing in the hole, continuing to dig, Henrikson asked him, "How much is this going to cost me?" Suckow had his back turned to Henrikson at this time, and he knew that Henrikson had a gun on him. Suckow replied that it would cost Henrikson $20,000. Suckow informed Henrikson that this was first degree murder and a death penalty offense. Suckow then turned towards Henrikson as he

1    was still in hole, and said "Do me a favor, don't shoot me in the back of the head
2    while I'm digging this hole."

3        When Suckow finished digging, he returned to the truck with Henrikson.
4    Suckow asked Dennis whether he had seen anyone, and Dennis said that he had been
5    asleep. Suckow then removed Clarke from the box, and carried him in a cradle
6    fashion. Clarke was stiff. Suckow could hear blood sloshing around the bag that was
7    tied around Clarke's head. Before placing Clarke in the hole, Suckow removed the
8    bag, and began undressing Clarke. Suckow placed Clarke's clothes in the bag.
9    Suckow then placed Clarke's body in the hole, in a seated position. Once Suckow
10   was finished burying him, he placed a stick across the grave.

11       After Clarke was buried, Henrikson, Suckow, and Dennis went to Suckow's
12   cabin so Suckow could take a shower and change his clothes. Suckow had blood all
13   over his clothes and boots. Suckow placed these items in a bag.

14       Suckow then got back in to the vehicle with Dennis and Henrikson. The group
15   then went back to Clarke's truck in Watford City, which had been previously parked
16   on a back street by Suckow, and drove it to Williston. Cell tower analysis on
17   Henrikson's and Clarke's cell phones show the two cell phones traveling in tandem
18   from Watford City to Williston, ND, where Clarke's vehicle was discovered
19   approximately two months after the murder.

20       Suckow drove Clarke's truck, while Dennis and Henrikson followed in Dennis'
21   truck. Suckow took Clarke's wallet and phone, which was located in the center
22   console. Suckow left the keys in the ignition, hoping that someone would steal the
23   vehicle. Suckow then discarded the wallet's contents. Suckow broke Clarke's cell
24   phone into pieces and threw it out the window of Dennis' truck as the three drove off.

25       After dropping Clarke's vehicle off in Williston, Suckow then got into the
26   vehicle occupied by Henrikson and Dennis. The three then traveled west of Williston,
27   ND on Highway 2 towards Montana. Dennis said he had a location where they could
28   burn Clarke's clothes, Suckow's clothes, and other evidence. Dennis drove to a

Plea Agreement - 12
P50925dd.AAA

location in a remote area that Dennis had been to previously for work.  Suckow got out of the vehicle and burned the evidence while Henrikson and Dennis remained in the vehicle.  According to Suckow, Henrikson later told him that he went back to the location and picked up all items from the burn pile.  This turned out to be untrue.  Based on Dennis' cooperation, these burnt items were recovered.  These items were shown to Suckow, who was able to identify the sole of Clarke's shoe, a button of Suckow's pants, parts of the cardboard box in which Clarke's body was transported, and parts of the tarp used to place dirt on during the shoveling.  Dennis would testify that the clothes recovered were the same clothes and shoes belonging to KC Clarke and Timothy Suckow.

The three then drove him back to Watford City.  On the way back, Suckow reminded Henrikson that he needed to get paid before he caught his train the next morning at 11 a.m.  Henrikson said he would have half ($10,000) of the money the next morning and would pay Suckow the remainder later.  Suckow said that was fine.  After returning to his cabin, Suckow called his wife, who was angry that he had not been answering his phone.

Suckow was picked up early the next morning by Henrikson.  Henrikson had his wife, Sarah Creveling, in the truck.  Henrikson said he had to head to the shop first, and Suckow said that he would just hang out in the cabin until Henrikson got his business done.  Henrikson came back a little later with Creveling, and Suckow got into Henrikson's truck to catch his train.  On the way out of Watford City, Henrikson said he forgot the money owed to Suckow, and telephoned someone to take a manila envelope out of his safe.  This person was later identified as Ray Olness.  Olness met them half way and handed Henrikson the envelope, which Henrikson then handed to Suckow.  The envelope contained $10,000 in cash.  Olness later stated that Henrikson informed him that "we killed KC, he got hit too hard."

Suckow then departed on a train from Williston back to Spokane.  Shortly after returning back to Spokane, Suckow met with Delao.  They met at a bar near Spokane

Plea Agreement - 13

P50925dd.AAA

Community College. Suckow informed Delao that while in North Dakota, "I had to do more than what I signed up for."

Approximately two weeks after returning from North Dakota, Suckow received a call from Henrikson and was informed that he had the rest of his money. Henrikson informed Suckow that he should think about staying in North Dakota, and that Henrikson could get him a job. Suckow and his wife traveled to North Dakota. Suckow brought a shovel with him because he planned to move Clarke as he did not trust Dennis. Suckow arrived in Watford City, North Dakota, late on a Friday night. Suckow introduced his wife (Joann) to Henrikson. Suckow stayed in the same cabin that Henrikson had previously provided him. Suckow showed Henrikson the shovel in the back of his vehicle, and informed Henrikson that he wanted to move Clarke's body. Henrikson said, "It's all good. Don't sweat it." Suckow asked Henrikson about Dennis, and whether they could trust him. Henrikson stated that they could. Henrikson stated that he would not have Suckow's money until the next day.

The next day, Suckow and Joann did some sightseeing and looked at an apartment. They traveled to Williston, ND. Joann did not like the area. Suckow also did not like the area and believed it was too expensive to live in. Later that evening, Suckow, with his wife, went back to Clarke's truck alone. He took a can of WD-40 with him and was wearing cotton gloves. He placed the WD-40 on his gloves to wipe down the truck. As he was doing so, he found a gun case under the back seat, which had a .45 caliber Ruger pistol in it. Two Ruger magazines were later recovered during the investigation. Suckow confirmed that these magazines likely belonged to Clarke as he did not own a Ruger. Suckow decided to take the case containing the firearm and placed it under his coat. Suckow placed the case under his backseat while his wife was not looking.

Later that evening, Suckow met Henrikson at his shop and obtained the remainder of the money owed. Henrikson came outside the shop and handed the money to Suckow in a box. Suckow got out of the truck so his wife could not see

Plea Agreement - 14

P50925dd.AAA

1   what Henrikson was handing him.  The box contained $10,000.  Henrikson asked
2   Suckow if he was going to stay, and Suckow informed Henrikson that his wife did not
3   like the area, and he was going to head back.
4          Suckow left Watford City that night and drove directly back to Spokane,
5   arriving sometime around noon on Sunday.  Suckow said that after the Clarke murder,
6   in the late summer of 2012, Delao came to his house and inquired about Clarke's gun.
7   Delao would testify that Henrikson became aware that Clarke's weapon was missing
8   from his truck, and that he believed Suckow had taken it.  Henrikson ordered Delao to
9   personally visit Suckow and destroy the gun.  Delao told Suckow that federal agents
10  had questioned Henrikson about the murder and knew that Clarke's gun was missing
11  from the vehicle.  Suckow was storing the gun at his storage unit.  Suckow and Delao
12  picked up the firearm from the storage unit, took it to Suckow's garage, and placed it
13  in a vice.  Before doing that, Delao took a photo of the gun and sent Henrikson the
14  photo as proof that the gun was being destroyed.  Suckow threw the pieces of the gun
15  in an asbestos waste dumpster at IRS Environmental.   The photograph was later taken
16  by law enforcement from Delao's phone.  It had a date stamp of August 11, 2012.
17  Phone analysis showed texts between Delao and Henrikson discussing the destruction
18  of the firearm.   The following text message from Robert Delao to James Henrikson
19  on August 12, 2012 corroborates witness statements:
20         *I got to experience first-hand disposal of toxic material. First it's shredded.*
21         *Then it's wrapped piece by piece with special tape. Then sealed in a barrel with*
22         *skull stickers all over it. Then buried in a special landfill. The actual burial is*
23         *Tuesday. Once I see that and learn the whole process I'll back to work in the*
24         *shop that night*
25         After the Clarke murder, Suckow and Henrikson rarely directly communicated.
26  However, Henrikson did ask him to come to North Dakota to finish the Steve Kelly
27  job.
28
Plea Agreement - 15
P50925dd.AAA

1    KC Clarke had informed his friend Rick Arey that he was fearful of Henrikson,
2    and that he did not want Henrikson to find out he was leaving Henrikson's
3    employment.   Clarke was so concerned for his safety that he gave Arey a contact
4    number for Clarke's grandfather in case he went missing, and Clarke began target
5    shooting his firearm.

6    C. <u>DOUGLAS CARLILE MURDER</u>:

7    Douglas Carlile was murdered on December 15, 2013, by Timothy Suckow in
8    Spokane, Washington.  James Henrikson then in North Dakota, based on a telephone
9    call, ordered Robert Delao to contact Suckow to commit the murder.  Delao used a
10   cellular telephone to contact Suckow.  Suckow was to be paid $20,000 for the Carlile
11   murder, but was arrested the day before he was to receive payment.

12   Carlile was shot and killed in his home located at 2505 S. Garfield Road,
13   Spokane, Washington, which is within the Eastern District of Washington.  The
14   intruder, who was later identified as Timothy Suckow, fired seven rounds at Carlile,
15   striking him six times causing twelve separate gunshot wounds (including exit
16   wounds).  This included a gunshot wound to the mouth area (below right nostril), two
17   wounds to the chest area, one wound to the left shoulder area,  one wound to the left
18   rib area, and one wound to the right forearm.

19   The Carlile murder had three separate motivations, all of which are intertwined
20   with Henrikson's previous business dealings with Carlile: 1) Henrikson believed that
21   Carlile had lied to Henrikson about securing additional investors on a joint oil drilling
22   lease venture in which Henrikson had invested approximately $640,000;  2) Carlile
23   failed to return the investment Henrikson made for the oil drilling investment, which
24   Carlile had promised to do within 90 days with 100% profit; and 3) Henrikson was
25   informed by at least one potential investor that if Carlile withdrew from the oil drilling
26   venture, this investor would consider funding the project.  Henrikson attempted to
27   have Carlile withdraw from the venture, but Carlile refused.
28

Plea Agreement - 16
P50925dd.AAA

At the time of the Carlile murder, Douglas and his wife Elberta, had just returned home around 7 p.m. Timothy Suckow was lying in wait at the side of the Carlile house awaiting his return. After parking the vehicle in the driveway, Elberta Carlile entered the residence through a back-door. Douglas Carlile went back to close the drive-way gate. He then proceeded into the house via the same rear-entrance his wife had earlier entered. As he was attempting to close the door, Timothy Suckow came up behind Carlile. Douglas Carlile noticed that the door did not close behind him, and turned around and saw Suckow. Suckow kicked the door open. Suckow then pulled a .45 caliber pistol and pointed it at Carlile.

According to Elberta, she was already upstairs when she heard a conversation downstairs, and assumed one of her sons had come to the house. She heard her husband say, "You don't have to do this." According to Suckow, Carlile softly said, "Get the gun." Suckow then saw Elberta Carlile after she came down the stairwell, and she appeared to be holding something in her hand. Elberta would testify that she saw a white male, wearing all black with his head covered (Suckow was wearing a balaclava and was wearing a black ballistics vest). According to Elberta, her husband yelled at her to go back upstairs, and as she ran upstairs, she heard multiple gun shots. She hid in the bedroom closet and called 911.

After Suckow shot Carlile multiple times at close range, he ran out of the same entrance he had come in and proceeded to the back yard, through a neighbor's yard, and ran through the backstreets of the neighborhood and past a local elementary school. The elementary school has a camera system, which caught Suckow running past but no facial characteristics could be discerned. Another camera system, owned by a private individual, caught a white van drive away, conduct a U-turn, and head in the direction of Suckow's flight. Suckow said that after the murder, he texted or called Delao and stated, "tell the Boss to watch the news." Call analysis confirms that Suckow made a call to Delao immediately after the murder. Suckow later texted Delao several times about getting paid. Suckow said that Christmas was coming, and

Plea Agreement - 17
P50925dd.AAA

he needed the money to buy gifts.  Delao stated that Henrikson asked him why Suckow did not kill Elberta Carlile.

Suckow and Delao eventually agreed to meet at the 7-11 located at the Pines exit.  It is believed that this meeting occurred prior to Christmas, 2013.  During this meeting, Suckow gave Delao a drop-phone he had purchased at Wal-Mart, and asked Delao to give it to Henrikson.

Suckow asked Delao when he was going to get paid.  Delao said he would get the money soon.  Suckow later contacted Delao, and Delao said that he was in North Dakota and that he would get him the money soon.  Suckow was arrested on a Monday, and was supposed to get paid that Tuesday.  Suckow said that both Wahrer and Pesina had been bugging him about getting paid.  Texts recovered from Pesina and Suckow's phone corroborate that claim.

Prior to the murder of Douglas Carlile, in late August or early September, 2013, Delao met with Suckow at Riverfront Park (Spokane, WA) near the Ferris wheel. Delao told Suckow about Tex Hall, who Delao described as a prominent politician with the Indian tribe in North Dakota.  Delao told Suckow that Henrikson had impregnated Hall's daughter.  Delao brought up Henrikson's pill making business again, and that Henrikson had the pill press and was trying to acquire some "dope" to manufacture Oxycodone pills.   During this conversation, Delao mentioned "taking care of someone local."  Delao claimed that this person had embezzled a quarter of a million dollars from Henrikson's business (this claim against Carlile was found to be untrue).  Delao stated that if Suckow killed this person he could take this person's percentage of an oil drilling venture which had several partners.  Delao said that Suckow could make a quarter of a million dollars a year which may be paid in quarterly payments.  Suckow said that he did not feel like killing anyone else, and Delao then said that he would check with the Boss (Henrikson) and maybe Suckow could simply beat him up.  Suckow said he would be interested, and that Delao should give him a name and address.  Delao said he would give Suckow the information and

Plea Agreement - 18

he would send it via a bogus email account.  Suckow asked how much he would get paid.  Delao responded that he would have to check with the Boss, but that it would probably be a couple of thousand dollars.

Approximately three weeks after meeting with Delao in Spokane, Suckow received an email from Delao with a photograph of Carlile as well as Carlile's address (this email with photo and address was recovered by law enforcement).  Delao also texted Suckow that it was okay to treat Carlile as a Piñata, which Suckow took to mean that he was just to give Carlile a beating.  However, according to Suckow, Delao informed him that Henrikson later was upset with Delao because he (Henrikson) wanted Carlile murdered and not just beat up.  Suckow texted Delao and said that he did not think that was such a good idea.  Delao responded via text, and stated that he had spoken to the Boss, and that a "piñata party" would be sufficient.  However, by October, 2013, Delao again contacted Suckow and stated that the Boss wanted Carlile murdered.  Suckow agreed to murder Carlile.  Suckow stated he was willing to do it because he needed the money, and the $2000 he was going to be paid for beating Carlile up would not be sufficient.

Delao created two email accounts:  kittyKittyKitty17@yahoo.com and tastyplumpblackgirls@yahoo.com.  These email accounts have been reviewed.  They indicate that the decision to murder Carlile no later than October 5, 2013.  The emails indicate that the "boss" wanted the Carlile job done before Halloween.  E-mail exchanges between Suckow and Delao on October 5, 2013, include a photograph of Carlile and his home address, as well a description of Carlile's vehicles and residence.  According to the emails, Delao sent Suckow a message that the boss thinks that "job" should cost him less than "last time" because it was a local job.   Suckow said that Delao continued to inform him that the Boss wanted Carlile killed instead of just hurting him.  Suckow and Delao eventually agreed that the payment for killing Carlile "would be the same as the last time (Clarke)", which was $20,000.

Plea Agreement - 19
P50925dd.AAA

After acquiring the information from Delao, Suckow did some surveillance of Carlile's house. Suckow assumed Carlile may have some of that money in the house. With the intent of also robbing Carlile, Suckow texted Delao about whether Carlile had a "treasure chest" (safe) in the house. Delao texted back that he would check with the Boss (Henrikson) and let him know. Delao eventually texted back, and informed Suckow that it was unknown whether Carlile had a safe, but that Carlile was known to be a "leprechaun," which Suckow took to mean that Carlile had precious metals in the house. Delao texted Suckow and stated that the Boss said that if Suckow got more than $200,000, he wanted the rest. Review of text messages by law enforcement corroborates these communications between Delao and Suckow.

On December 6, 2013, Suckow and Justin Doyle did surveillance at the Carlile house. During this surveillance, Suckow used a .25 caliber pistol to shoot a street light out. This round was recovered later by Spokane Police Department Detective Mark Burbridge. Suckow said that Doyle was supposed to receive half of the proceeds for doing the job. However, Carlile was not at home. Suckow said that at this point, he was only going to beat-up Carlile and conduct a home invasion. Review of texts by law enforcement indicate that Suckow was not being truthful in an effort to protect his friend, Doyle, and that in fact the plan to kill Carlile was already in play. Phone analysis reveals that Suckow called Delao around 10:00 p.m., and Delao almost immediately thereafter texted Henrikson the following:

goddamit! Pinata aint home. Gota wait. Tired of waiting. Want it done.

According to phone records reviewed by the Carlile family, Doug Carlile and his wife were in Moses Lake, babysitting their grand-kids. On December 6, 2013, Delao texted Henrikson to inquire whether Carlile had an alarm system. Henrikson, who had previously been to the Carlile's on at least two prior occasions during social visits, texted Delao back, "I highly doubt it."

On December 9, 2013, Henrikson sent the following message to Delao:

Pinata Party

Plea Agreement - 20
P50925dd.AAA

Suckow acquired a SWAT vest marked with "Police" insignia. Suckow believed that Carlile would be more compliant if Carlile thought Suckow was a police officer. Suckow also recruited Lazaro Pesina and Robbie Wahrer to assist in the murder of Carlile. He knew Pesina based on their past employment at IRS Environmental. The agreement was that they would all share a third of the proceeds and what was stolen from the house. Suckow asked Wahrer to acquire a vehicle to use on the night of the murder, but Wahrer was unable to do so. So, the day of the murder (December 15, 2013), Suckow acquired a van from his employer, IRS Environmental. Suckow acquired some white masking tape and black construction paper from Hobby Lobby, and while Suckow dressed in the back of the van, Wahrer taped the construction paper over the windows, taped over the IRS business insignia, and pulled off the license plate. Suckow placed a temporary license plate card on the back window of the van. Suckow manufactured this temporary plate. Pesina's fingerprint was later found on the back window near the temporary license plate. Accrding to Suckow, he never informed Pesina or Wahrer about his intent to murder Carlile. He did inform them they would rob Carlile, and that they would acquire oxycodone pills from "the Boss" to resell in Spokane if they assisted him.

On December 15, 2013, Delao told Suckow that it was imperative that Carlile not be able to make a meeting set for the next day. Delao informed Suckow that Carlile had to be taken care of permanently. Delao would testify that this order came from Henrikson. Suckow and Pesina approached the Carlile property from the northeast, and went across a neighbor's yard, and over a fence. Both Suckow and Pesina were wearing trench-coats. As they crossed into the neighbor's yard, they laid the trench-coats on the ground. The driveway of the house is clearly visible from the backyard, and Suckow realized that no one was home. They crouched in a patio area on the northeast portion of the house and waited for Carlile to return home.

During his interview, Suckow stated that he brought the wrong ammunition for the shotgun, and sent Pesina back to the van with the shotgun to collect the

Plea Agreement - 21
P50925dd.AAA

appropriate ammunition.  Suckow told Pesina to take the trench coats with him to the van.  Before Pesina left, Suckow called Wahrer to pick Pesina up at a pre-arranged "extraction point".  As Pesina left, he picked up the trench-coats.  According to Suckow, he had a welder's glove in case he had to break a window.  At this point, the welding glove fell out of Suckow's gear.  This glove was later found to have Suckow's DNA in it.  Pesina did not notice the glove on the ground, and neither did Suckow, because it was dark.  Suckow was dressed in police tactical gear and had a badge on his vest.  Suckow stated that after Pesina left, he could not find his Smith and Wesson .45 caliber pistol.  Suckow began looking for the pistol in the neighbor's backyard, but it was dark, so he had some difficulty in finding the firearm.  He finally was able to locate the pistol using the light from his walkie-talkie.

During this time, Suckow noticed that Wahrer had driven the van past the Carlile residence on several occasions.  Wahrer tried to communicate with Suckow on the walkie-talkie, but Suckow could not discern what was being said.  Suckow became nervous, and was about to leave, but then he saw car-lights coming up the driveway.  Suckow hid behind the northeast glass patio.  He observed Mrs. Carlile entering the back door entrance.   Mrs. Carlile proceeded in the entrance as Mr. Carlile was closing the gate.  As soon as Suckow saw Doug Carlile, he walked behind him, and as Carlile tried to close the door, Suckow kicked the door open.

According to Suckow, he pushed Carlile into the house.  Carlile had his hands raised, and he turned his face, and said softly, "Elberta, get your gun."  According to Suckow, Delao had told him to tell Carlile that this was because of a drug debt one of his sons owed.  Carlile had informed John Wark and Bill Curtiss about one his sons having drug problems.  There are email exchanges between Delao and Suckow in which Delao specifically instructs Suckow to spray paint that "this was done because of your son."  Henrikson wanted law enforcement to believe that Carlile was killed because of his son's drug connections.

Plea Agreement - 22
P50925dd.AAA

Suckow asked Carlile where he kept his money.  Suckow repeated this several times, and then noticed Mrs. Carlile standing at the bottom of the stairs.  They looked at each other for a few seconds. Mrs. Carlile went back up the stairs.  Mr. Carlile then moved his hand.  According to Suckow, he unloaded the pistol.  Suckow then ran out the back door, through the yard, jumped over the fence into the neighbor's yard, and then past an elementary school, and down a small dirt road.  He met the van at a prearranged location.  The camera system at the elementary schools depicts an individual running past at approximately 7:02 p.m.

Suckow got into the van and told Wahrer that he shot Carlile and to drive away. As Wahrer was driving, Suckow changed his clothes.  After a few minutes, Suckow directed Wahrer to stop the van and pull over.  Suckow then told Wahrer and Pesina to rip the tape off the van which had been used to cover the commercial insignia.  In the meantime, Suckow replaced the license plate.  Suckow then drove the van back to his residence and dropped off Wahrer, who had parked his car there.  Suckow and Pesina then went to the IRS Environmental Shop, dropped off the van, and picked-up Suckow's vehicle.  Suckow and Pesina then went back to Suckow's residence and unloaded the vehicle.  Suckow then drove to Mirabeau Park, near the Kaiser Pump and broke-up the pistol and threw it into the river.  Suckow later took detectives to the location where he threw the pistol into the river.  Police divers looked for the gun parts but could not locate them.  This part of the river is fast-flowing. The parts likely washed down river.

When Suckow was arrested on or about January 13, 2014, his vehicle was searched pursuant to a Washington State search warrant.  In the vehicle, law enforcement seized an operational list created by Suckow.  The list contained the following items written out:  "glove?, badge, trench coat, two boots, LED light cap, radios with mics, window tinker, wheel man."  Written next to the words "wheel man" was "show scenic tour google earth check van for scheduling/magnetic signs, wipe tools down, practice with pistol."  Between the center console and front passenger

Plea Agreement - 23

P50925dd.AAA

seat, a black balaclava was found.  Suckow's cellular phone was seized. Henrikson's phone number was on Suckow's phone.

After the murder of Carlile, law enforcement discovered a number of phone texts between Suckow and Pesina.  During these texts, Pesina inquired when he should expect to get his share of the money.  Phone analysis on Henrikson's phone, indicates that between January 14, 2014 (Suckow publically named as suspect) and January 18, 2014, Henrikson used the web service on his cellular phone on seventy-seven separate occasions to read about the Carlile murder.  Between December 19, 2013, and December 20, 2013, Henrikson used his phone to conduct twenty-one separate searches regarding the Carlile murder.  Law enforcement was able to recover deleted texts on Henrikson's phone, including one text from Delao indicating that the Carlile job would be completed within one week, and another deleted text from Henrikson's phone stating  "I've got ways just kill them all then IM chief standing alone."  It could not be determined whether Henrikson sent or received the text.

6.    United States Sentencing Guideline Calculations:

The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter U.S.S.G.) are applicable to this case and that the Court will determine the Defendant's applicable sentencing guideline range at the time of sentencing.

a)    Offense Level:

The United States and the Defendant do not agree nor does either party make any representation as to the offense level.  But for the Fed. R. Crim. P. 11(c)(1)(C) nature of this Plea Agreement, the United States submits that the Defendant would be facing multiple sentences of life imprisonment.  The United States does agree to reduce the Defendant's final offense level, as will be calculated in the U.S. Probation's Presentence Investigation Report, by three (3) offense levels pursuant to U.S.S.G. § 3E1.1(a) and (b) if the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal

Plea Agreement - 24

P50925dd.AAA

conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; accepts this Plea Agreement; and enters a plea of guilty no later than September 25, 2015.  The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, not recommend a three (3) level downward reduction for acceptance of responsibility and timely plea if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

Furthermore, the Defendant agrees to pay the $200.00 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment, as a condition to this recommendation by the United States.

b)      Criminal History:

The United States and the Defendant understand that the Defendant's criminal history computation is tentative and that ultimately the Defendant's criminal history category will be determined by the Court after review of the Presentence Investigative Report.  The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined after the Presentence Investigative Report is completed.

7.      Incarceration:

a)      Length of Imprisonment:

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree to recommend a sentencing range to the Court of 0 (zero) to 40 (forty) years of incarceration.  **The Defendant understands that the United States will request that the Court impose a forty-year (40) sentence of incarceration** followed by a term of life-time supervised release.

If the Court does not accept the plea or chooses to sentence the Defendant to a greater term than the United States and the Defendant have agreed upon as set forth in this Plea Agreement, the Defendant may withdraw from the plea and this agreement is null and void.

8.    Criminal Fine:

The United States and the Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

9.    Supervised Release:

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree to recommend that the Court impose a life-time term of supervised release.

10.    Restitution:

The United States and the Defendant hereby stipulate and agree that, pursuant to 18 U.S.C. " 3663, 3663A and 3664, the Court should order restitution. The Defendant and United States agree to submit their respective calculations as to restitution to the Court at least thirty (30) days prior to sentencing.

11.    Forfeiture:

The Defendant, JAMES TERRY HENRIKSON, agrees not to contest the forfeiture of assets in the federal civil forfeiture cases pending in the District of North Dakota, Northwestern Division, *United States. v. Real Property located at 505 17th Avenue Northeast, Watford City, North Dakota, et al.*, Case No. 4:14-CV-00007-DLH-CSM, and *United States v. Mineral Interests in Oil and Gas Lease, etc.*, Case No. 4:14-CV-000092-DLH-CSM.

The Defendant acknowledges that all of the assets covered by this agreement are subject to forfeiture as proceeds of illegal conduct, and are forfeitable to the United States pursuant to 18 U.S.C. § 981 (civil forfeiture) because the assets constitute proceeds or are traceable to proceeds of violations of 18 U.S.C. §§ 1341(mail fraud), 1343(wire fraud).

Plea Agreement - 26

P50925dd.AAA

Defendant agrees to voluntarily relinquish all right, title and interest in said assets in favor of the United States and hereby agrees to execute any and all forms and pleadings necessary to effectuate such forfeiture.

The Defendant agrees to fully cooperate with the United States and take all steps, as requested by the United States, to pass clear title to forfeitable assets to the United States. The Defendant's cooperation includes, but is not limited to: participating in any debriefings with respect to the assets and purchase of assets subject to civil forfeiture in the pending civil cases described herein, testifying truthfully at any trial or proceeding relating to the forfeiture of the assets, providing the United States with any information regarding any potential lienholder interests, and providing all of the Defendant's personal records which relate in any manner to the assets.

The Defendant also agrees to hold the United States, and any and all agencies, and their agents and employees harmless from any and all claims whatsoever in connection with the investigation, the prosecution of charges, and the seizure and forfeiture of assets covered by this Plea Agreement.

The Defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant waives further notice of proceedings involving the forfeiture of assets the Defendant is agreeing to forfeit in this Plea Agreement.

12. <u>Mandatory Special Penalty Assessment</u>:

The Defendant agrees to pay the $200.00 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. ' 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

Plea Agreement - 27
P50925dd.AAA

13.    Payments While Incarcerated:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, the Defendant agrees to earn the money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

14.    The United States Agrees:

a)    Dismissal(s):

At the time of sentencing, the United States agrees to move to dismiss the remaining counts of the Indictment. However, the Defendant understands that all relevant conduct from all of the Counts in the Indictment will be presented to the Court at sentencing.

b)    Not to File Additional Charges:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against the Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in this Indictment, unless the Defendant breaches this Plea Agreement any time before or after sentencing.

15.    Additional Violations of Law Can Void Plea Agreement:

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

16.    Appeal Rights:

Defendant understands that he waives his to appeal or challenge the convictions and sentence imposed by the Court so long as the Court accepts the Plea Agreement, and the Defendant receives a sentence of no more than forty (40) years imprisonment and term of life supervised release, a criminal fine of $100,000, and restitution of no

Plea Agreement - 28
P50925dd.AAA

more than $2,000,0000, the Defendant expressly waives his right to file any post-conviction motion attacking his conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any motion for reduction of sentence or other attack of the conviction or sentence, including but not limited to proceedings pursuant to 28 U.S.C. § 2255 (Writ of Habeas Corpus). Should this conviction be set aside, reversed, or vacated, this Plea Agreement is null and void and the United States may institute or reinstitute any charges against the Defendant and make derivative use of any statements or information the Defendant has provided.

17. <u>Integration Clause</u>:

The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case. This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities. The United States and the Defendant agree that this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

MICHAEL C. ORSMBY
United States Attorney

_____                    9/25/15
Aine Ahmed                                          Date
Assistant U.S. Attorney

_____                    9/25/15
Scott Jones                                         Date
Assistant U.S. Attorney

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____                    9-25-15
JAMES TERRY HENRIKSON                                Date
Defendant

Plea Agreement - 30
P50925dd.AAA

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept the Defendant's plea of guilty.

_____          _____
Mr. Mark Vovos                             Date    9-25-15
Attorney for the Defendant

_____          _____
Mr. Todd Jeffrey Maybrown                  Date    9/25/15
Attorney for the Defendant

Plea Agreement - 31
P50925dd.AAA