Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Russell E. Smoot
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         v.<br><br>JAMES TERRY HENRIKSON,<br><br>                    Defendant. | 2:14-CR-00124-TOR-1<br><br>Response to Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (ECF Nos. 1043, 1043.1) |

   Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney, for the Eastern District of Washington, and Russell E. Smoot, Assistant United States Attorney for the Eastern District of Washington, submits the following Response to Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.

**RESPONSE**

I.    **STATEMENT OF FACTS**

    **A.    Henrikson was convicted of Murder for Hire, Conspiracy to Commit Murder for Hire, Solicitation, and Conspiracy to Distribute Heroin and sentenced to two consecutive life sentences followed by at least 20 years.**

Between 2011 and 2013, Mr. Henrikson was involved in numerous questionable business ventures. *See generally*, PSIR ¶¶ 17-50. According to the PSIR, "[t]hroughout the course of Henrikson's business ventures in North Dakota, he worked with a variety of investors and employees * * *. It was through these business relations Henrikson met the men he would later order to be assaulted or murdered. *See id.,* at ¶ 50 (modified).

The first business venture of relevance commenced in June 2011, when Henrikson sought investors to secure funding to start a trucking company in North Dakota. *See id.,* at ¶ 17. One of the investors was J.M.,[1] who Henrikson promised would be fully compensated for his investment and receive a share of the profits. *See id.* According to a third party, R.O., when his investment was not repaid, J.M. made negative comments about Henrikson to other businessmen because J.M. had invested a lot of money, which was not returned. *See id.,* at ¶ 147. According to the PSIR, "An investigating agent also explained that [J.M.] had put out fraud alerts and propaganda via flyers and on the Internet, which warned other businessmen that Mr. Henrikson was a fraud." *See id.* In early 2013, Henrikson instructed co-defendant

---

[1] J.M. is the intended victim in Count 10. *See* ECF No. 17, at 6-7. J.M. was not murdered.

United States Response to Defendant's Motion
Under 28 U.S.C. § 2255 to Vacate Sentence - 2

Robert Delao to contact another co-defendant, Todd Bates, to arrange for the murder of J.M. for $20,000.[2] *See id.* Ultimately this murder did not occur.

The second business venture of relevance commenced in 2011 when Henrikson entered into an agreement to lease trucking services to S.K. to transport oil and water on Indian reservation land associated with the North Dakota oil fields. *See id.,* at ¶ 18. Within months of associating with S.K., Henrikson submitted and won another bid for trucking services on the MHA Indian Reservation, under a separate trucking firm formed by Mr. Henrikson. *See id.,* at ¶ 19. Because Henrikson was competing with S.K. through his secondary company, S.K. fired Henrikson. *See id.*, at ¶¶ 10-20. While not part of the EDWA Indictment, according to the PSIR, co-defendant Suchow (who ultimately murdered K.C., *see infra*) Henrikson initially discussed S.K. as a target of an "assault for hire" and then asked Suchow if he would be willing to kill S.K. *See* PSIR ¶ 58. Ultimately S.K. was not murdered, but his business was vandalized by R.O. and others at Henrikson's direction. *See id.,* at ¶ 91. Notably, also not a part of the EDWA indictment, according to the PSIR, Henrikson also "wanted [R.O.] murdered because he had not returned a pill press that Mr. Henrikson planned on using for manufacturing oxycodone pills." *See id.,* at 95.

The third business venture of relevance commenced in 2011 when Henrikson was introduced to J.W., who went to work for one of Henrikson's trucking companies, Blackstone Crude. *See id.,* at ¶ 100. When J.W. began to believe that Blackstone Crude was destined to fail, he began looking for other work, which included partnering with another person in a new trucking company named Power Crude Trucking and competing with Henrikson's company. *See id.,* at ¶ 101. In late 2012, Henrikson instructed co-defendant Delao to contact co-

---

[2] Counts 5 and 10.

defendant Bates to assault or murder J.W.[3] *See id.,* at ¶¶ 102-124. Ultimately this murder did not occur.

A fourth business venture or relevance commenced in 2012 when Henrikson located an old friend, K.C., and convinced him to move to North Dakota and work for his trucking company named Blackwater LLC. *See* PSIR ¶ 51. When Henrikson failed to compensate K.C. for long hours of work, K.C. started looking for other employment. *See id.,* at ¶ 52. K.C.'s potential departure infuriated Henrikson, who was ultimately in contact with co-defendant Timothy Suckow, who travelled from Spokane to North Dakota to assault K.C. *See id.,* at ¶ 54. Upon arriving in North Dakota, Suckow met with Henrikson, who, according to Suckow, "was very upset, claiming that one of his employees, [K.C.], was leaving the company for a rival company and taking several employees with him." *See id.,* at ¶ 60.  Mr. Henrikson then "asked Mr. Suckow to kill [K.C.]," and they went to the shop where Henrikson's trucking company was based. *See id.* Henrikson then lured K.C. to the shop. *See id.,* at ¶ 61.

While waiting for K.C. to arrive, Henrikson talked to Suckow about murdering K.C. and initially suggested choking K.C. to death. *See id.,* at ¶ 62. Due to concerns with his ability to successfully choke K.C. to death, Suckow grabbed a tire iron and hid it by the door as K.C. was summoned the shop. *See id.* When K.C. entered the shop, Henrikson "distracted" K.C. while "Suckow came up behind [K.C.], and proceeded to hit him approximately four times in the head with the jack handle[,]" apparently crushing K.C.'s skull with the fourth hit. *See id.* Henrikson and Suckow then worked to clean up the blood and dispose of K.C.'s body in an undisclosed hand-dug, shallow grave.[4] *See id.,* at ¶¶ 63, 67-71. Henrikson agreed to

---

[3] Count 4.

[4] Counts 1 and 7.

United States Response to Defendant's Motion
 Under 28 U.S.C. § 2255 to Vacate Sentence - 4

pay Suckow $20,000. *See id.,* at 70.  Notably, after the brutal, bloody murder, according to the K.C.'s mother, when it was believed that K.C. was "missing," Henrikson "befriended" her and made it appear that he was trying to help find K.C." *See id.,* at ¶ 205.

A fifth business venture commenced in late 2011 to early 2012, during which time T.S.[5] introduced Henrikson to D.C.[6] *See id.,* at ¶  31.  Ultimately a trucking company named Kingdom Dynamics Enterprises ("KDE") was formed by Henrikson and D.C. and two other investors to make money in the booming North Dakota oil business. *See id*., at ¶¶ 31-32. Henrikson insisted that D.C. leave Henrikson's name off the business paperwork, so Henrikson had no legal rights relevant to KDE and relied solely upon D.C. to share the business profits. *See id.,* at ¶ 33. D.C. and the other investors expected Henrikson to run the KDE (which financed multiple trucks) and repay their investments. *See id.,* at 36. Henrikson falsely told the investors that KDE was not making any money. *See id.*[7]

In 2013, the owners of KDE and others invested approximately $1,676,800 in a tract of land for the purpose of drilling oil. *See id.,* at ¶ 37. Henrikson invested approximately $640,000 under the name of his wife, and an alias. *See id.* D.C.

---

[5] T.S. is the intended victim in Counts 6 and 9. *See* ECF No. 17, at 4-6.  J.M. was not murdered.

[6] Counts 2, 3, and 8.

[7] In the meantime, Henrikson and D.C. had formed a side company named Bridgewater Energy that, unbeknownst to the other KDE investors, were using the KDE-purchased trucks to compete with KDE. *See id.,* at ¶ 40. When the other investors learned of Bridgewater Energy, D.C. promised them that D.C. and Henrikson would make payments for the truck – which did not occur. *See id.*

United States Response to Defendant's Motion
 Under 28 U.S.C. § 2255 to Vacate Sentence - 5

promised all the investors that their loans would be doubled and paid back within 90 days of the investment – which never occurred. *See id.*

Concerning the tract of land, D.C. unsuccessfully sought other investors for funding of the drilling operation. *See id.,* at ¶ 39. D.C., however, began falsely telling business partners that he had secured the funding and when Henrikson concluded that D.C. had lied, Henrikson became angry. *See id.,* at ¶ 41. Due to the lack of funding, the oil drilling venture began to fall apart. *See id.,* at ¶ 43. Although D.C. told Henrikson that he had secured another investor, Henrikson was advised by a third-party that if he wanted the new investor to provide funding, D.C. had to remove himself from KDE. *See id.,* at ¶¶ 43-44. D.C. refused to withdraw from KDE. *See id.*

In late summer 2013, co-defendants Delao and Suckow met in Spokane to discuss the fact that Henrikson wanted to acquire some "dope" and use the pill press he possessed to manufacture oxycodone pills. *See id.,* at ¶ 158. During the meeting, "taking care of [D.C.]" was discussed. *See id.* Law enforcement's subsequent review of emails between Delao and Suckow uncovered Henrikson's desire to have D.C. murdered by Halloween. *See id.,* at ¶ 159. The price for the murder, as with K.C., would be $20,000 and it would be paid by Henrikson. *See id.,* at ¶ 160.

The murder did not occur before Halloween. However, when Henrikson learned that D.C. planned to meet with a new investor on December 17, 2013, Henrikson became concerned that because his name was not on any legal documents, he would have no way to prevent D.C. from cutting him out of KDE. *See id.,* at ¶ 165. A meeting regarding this investor, was scheduled for December 16, 2013, and due to his concern that he would be bought out of the business, Henrikson became more insistent that D.C. would not be able to attend the meeting. *See id.,* at ¶ 168.

On December 15, 2023, Suckow and two others hid near D.C.'s home until D.C. arrived. *See id.,* at ¶ 174. According to the PSIR, when D.C. and his wife arrived,

> Suckow followed [D.C.], pushing in the door behind him, ending up in the kitchen area. Suckow could see that [D.C.'s wife] was on the stairway * * *. Suckow held [D.C.] at gunpoint, and Suckow recalled him saying "You don't have to do this," and making comments to his wife to get the gun.[8] [D.C.'s wife] began walking up the stairs to escape Suckow and called police while hidden in a closet.

> Suckow shot [D.C.] six times, in various parts of his body, to include his face, the chest area, and his arm

> * * *

> Police officers arrived at the [D.C.'s] residence shortly after [D.C.] was shot, and emergency services attempted to render aid. However, [D.C.] died as a result of the numerous gunshot wounds to his body, and was pronounced dead at the scene.

*See id.,* at ¶¶ 176-177 (modified).

After a lengthy investigation, Henrikson was charged as follows:

| Count | Charge | § 1958(a) Enhancement |
| --- | --- | --- |

---

[8] According to PSIR ¶ 180 (modified),

> Interviews with family members, * * * revealed that they believed Henrikson hired someone to murder [D.C.]. [D.C.'s wife] told police that, several weeks earlier, her husband had been working in Watford, North Dakota, with Henrikson. When [D.C.] returned, he told his wife that Henrikson had assaulted him and threatened him. [D.C.] went on to tell his children that if anything happened to him, it was Henrikson who did it, and one son even gave [D.C.] a firearm for personal protection because of these threats. One of the sons also identified Robert Delao as Henrikson's "right hand man," and considered him to be dangerous.

| 1 | Murder for Hire (K.C. intended victim), in violation of 18 U.S.C. § 1958(a) | Death Resulting. |
|---|---|---|
| 2 | Murder for Hire (D.C. intended victim), in violation of 18 U.S.C. § 1958(a) | Death Resulting. |
| 3 | Conspiracy to Commit Murder for Hire (D.C. intended victim), in violation of 18 U.S.C. § 1958(a) | Death Resulting. |
| 4 | Conspiracy to Commit Murder for Hire in (J.W. intended victim), violation of 18 U.S.C. § 1958(a) | None. |
| 5 | Conspiracy to Commit Murder for Hire (J.M. intended victim), in violation of 18 U.S.C. § 1958(a) | None. |
| 6 | Conspiracy to Commit Murder for Hire (T.S. intended victim), in violation of 18 U.S.C. § 1958(a) | None. |
| 7 | Solicitation to Commit Murder for Hire (K.C. intended victim), in violation of 18 U.S.C. §§ 373(a), 1958(a) | Death Resulting. |
| 8 | Solicitation to Commit Murder for Hire (D.C. intended victim), in violation of 18 U.S.C. §§ 373(a), 1958(a) | Death Resulting. |
| 9 | Solicitation to Commit Murder for Hire (T.S. intended victim), in violation of 18 U.S.C. §§ 373(a), 1958(a) | None. |
| 10 | Solicitation to Commit Murder for Hire (J.M. intended victim), in violation of 18 U.S.C. §§ 373(a), 1958(a) | None. |
| 11 | Conspiracy to Distribute Heroin, in violation of 21 U.S.C. 841(a)(1), (b)(1)(B)(i), 846 | N/A |

*See* ECF No. 17 (Indictment). After a jury trial, Henrikson was found guilty on all eleven counts. *See* ECF No. 761 (Verdict). The verdict form specifically noted the deaths of K.C. and D.C. relevant to Counts 1, 2, 3, 7, 8. *See id.*

In June 2016, Henrikson was sentenced as follows:

| Count | Conviction | Sentence |
|-------|-----------|----------|
| 1 | Murder for Hire (K.C. intended victim), in violation of 18 U.S.C. § 1958(a) | Mandatory Life |
| 2 | Murder for Hire (D.C. intended victim), in violation of 18 U.S.C. § 1958(a) | Mandatory Life (Concurrent to Ct. 3, Consecutive to Ct. 1) |
| 3 | Conspiracy to Commit Murder for Hire (D.C. intended victim), in violation of 18 U.S.C. § 1958(a) | Mandatory Life (Concurrent to Ct. 2, Consecutive to Ct. 1) |
| 4 | Conspiracy to Commit Murder for Hire in (J.W. intended victim), violation of 18 U.S.C. § 1958(a) | 10 Years (Concurrent to Cts 5, 6, Consecutive to Cts. 1-3) |
| 5 | Conspiracy to Commit Murder for Hire (J.M. intended victim), in violation of 18 U.S.C. § 1958(a) | 10 Years (Concurrent to Cts 4, 6, Consecutive to Cts. 1-3) |
| 6 | Conspiracy to Commit Murder for Hire (T.S. intended victim), in violation of 18 U.S.C. § 1958(a) | 10 Years (Concurrent to Cts 4, 5, Consecutive to Cts. 1-3) |
| 7 | Solicitation to Commit Murder for Hire (K.C. intended victim), in violation of 18 U.S.C. § 1958(a) | 20 Years (Concurrent to Ct. 1) |
| 8 | Solicitation to Commit Murder for Hire (D.C. intended victim), in violation of 18 U.S.C. § 1958(a) | 20 Years (Concurrent to Cts. 2, 3) |
| 9 | Solicitation to Commit Murder for Hire (T.S. intended victim), in violation of 18 U.S.C. § 1958(a) | 5 Years (Concurrent to Cts, 4, 5, 6) |
| 10 | Solicitation to Commit Murder for Hire (J.M. intended victim), in violation of 18 U.S.C. § 1958(a) | 5 Years (Concurrent to Cts, 4, 5, 6) |
| 11 | Conspiracy to Distribute Heroin, in violation of 21 U.S.C. 841(a)(1), (b)(1)(B)(i), 846 | 10 Years (Consecutive to Cts. 1-6) |

*See* ECF No. 683, at 4. Henrikson did not file a direct appeal nor has he filed any prior 28 U.S.C. § 2255 petitions.

> **B.    Seven years after sentencing, Henrikson filed a § 2255 petition challenging the validity of his solicitation convictions in light of *United States v. Linehan.***

In 2023, Henrikson filed his first § 2255 petition, requesting this Court to vacate his convictions for solicitation to commit murder for hire – i.e., Counts 7-10. *See* ECF Nos. 1043, 1043.1. In short, Henrikson asserts that *United States v. Linehan*, 56 F.4th 693 (9th Cir. 2022), in which the government conceded that murder for hire in violation of 18 U.S.C. § 1958(a) did not qualify as a "crime of violence," does not thus support a conviction for solicitation of a crime of violence, in violation of 18 U.S.C. § 373. Henrikson asserts that based on *Linehan*, he is "actually innocent" of Counts 7-10. *See* ECF No. 1043.1, at 7-11.

## II.    ARGUMENT

As noted *infra*, the United States <u>agrees</u> that *Linehan* controls Counts 9 and 10. However, because "death resulted" relevant to Counts 7 and 8, the United States *does not concede* that *Linehan* controls and respectfully requests this Court – at least in reference to Counts 7 and 8 – to partially dismiss Henrikson's § 2255 as untimely and unsupported by a showing of "cause and prejudice."[9]

---

[9] Henrikson asserts that his "actual innocence" on Counts 7-10 provides an exception to both the 1-year statute of limitation for initial habeas petitions and the procedural default defense. *See id.,* at 7 (citing *United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003) and *McQuiggins v. Perkins,* 569 U.S. 383, 387 (2013)). The United States agrees that to the extent a defendant may be "actually innocent" of Counts 9 and 10, the United States <u>*does not invoke*</u> either the statute of limitations or procedural default defenses.

**A.** **Because Murder For Hire Has Only Been Found to Not Qualify as a Solicitation Crime of Violence when Death Has _Not_ Resulted, this Court Can Grant in Part, and Dismiss in Part, Henrikson's § 2255 Motion to Vacate Counts 7-10.**

In *United States v. Linehan*, the Ninth Circuit "address[ed] whether, under the categorical approach, two predicate crimes—transportation of an explosive, 18 U.S.C. § 844(d), and using a facility of interstate commerce with intent that a murder be committed, 18 U.S.C. § 1958(a)—are crimes of violence under § 373(a)." 54 F.4th 693, 697 (9th Cir. 2022). Ultimately the Ninth Circuit held that "§ 844(d) is a categorical match to § 373(a), but that a violation of § 1958(a) is not," noting the government's concession of the latter. *Id.*

Before addressing the specific statutes at issue, the Ninth Circuit explained that § 373, "entitled 'Solicitation to commit a crime of violence,'" requires the government to prove that the offense solicited "constitute[es] a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another[.]" *Id.* at 698 (quoting 18 U.S.C. § 373(a)).

Further, "[t]o determine whether a defendant solicited a qualifying federal offense, we apply the categorical approach." *Id.* at 698-99 (citing *United States v. Devorkin*, 159 F.3d 465, 469 (9th Cir. 1998) ("[W]e hold that § 373 requires a categorical approach, rather than a fact-based, case-by-case analysis of the actual result of the solicitation."); *see also, e.g.*, *United States v. Doggart*, 947 F.3d 879, 887–88 (6th Cir. 2020) (applying categorical approach to § 373(a)); *United States v. Gillis*, 938 F.3d 1181, 1201 (11th Cir. 2019) (per curiam) (same). Pursuant to the categorical approach, the court considers "not the specific facts of a given conviction but whether the elements of the predicate offense meet the federal definition of a "crime of violence." *Id.* at 699 (citing *Moncrieffe v. Holder*, 569 U.S. 184, 190, (2013)).

The Ninth Circuit noted that "[t]he language used in § 373(a) is substantially similar to other "crime of violence" or "violent felony" provisions found elsewhere in the federal criminal code[,] [*s*]*ee* 18 U.S.C. §§ 16(a), 924(c)(3)(A), 924(e)(2)(B)(i)[,] [and] [a]lthough we have not before interpreted § 373(a)'s "elements clause" (also known as a "force clause") to any great extent, the parties agree that the same basic framework used for other elements clauses applies to the elements clause in § 373(a)." *Id.* In assessing both § 844(d) and § 1958(a), the "key question" was whether the statutes "have as an element the use, attempted use, or threatened use of physical force." *Id.* The Ninth Circuit's analysis of the latter statute, § 1958(a), is relevant here.

First, the Ninth Circuit recited the statute as applied to Linehan's case – (more discussion to follow, *see infra*) –

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned not more than twenty years, or both ....

*Id.* at 706 (ellipses included and remaining text of § 1958(a) omitted in *Linehan*). The court then noted that the government would have to prove the following elements to secure a conviction: "To be convicted of violating § 1958(a), an offender must (1) have traveled or caused another to travel in interstate commerce, or used or caused another to use an instrumentality of interstate or foreign commerce, or conspired to do the same; (2) have done so with the intent that a murder be committed; and (3) have intended that the murder be committed in exchange for something of pecuniary value." *Id.* at 707 (citing Ninth Cir. Model

Crim. Jury Instruction No. 16.7 (2022); *see also United States v. Phillips*, 929 F.3d 1120, 1123 (9th Cir. 2019)).

Second, the court noted that the government "conceded on appeal that § 1958(a) is, in fact, not a predicate offense under the elements clause of § 373(a)." *Id.* While the court further noted that "[t]he government's concession is based on the Solicitor General's same concession several months ago in *Grzegorczyk v. United States*, —— U.S. ——, 142 S. Ct. 2580, 213 L.Ed.2d 1128 (2022)[,]" the court's quotation of "the Solicitor General explanation in that case" did not include a reference to the aggravated element of death resulting. *Id.* Rather, the court stated that the Solicitor General explained that § 1958(a)

> require[s] only that a defendant travel in, or use a facility of, interstate commerce with the requisite criminal intent; it does not require that a defendant actually enter into a murder-for-hire agreement, that he carry out or otherwise attempt to accomplish his criminal intent, or that the contemplated murder be attempted or accomplished by another person.

*Id.* (quoting Br. of United States at 9, *Grzegorczyk*, —— U.S. ——, 142 S. Ct. 2580 (No. 21-5967) (quotations and emphasis omitted in *Linehan*)). The court concluded that it agreed with the Solicitor General's analysis in regard to Linehan's conviction, but expressly left the question open of "whether the aggravated offenses of § 1958(a)—which impose longer terms of imprisonment if personal injury or death results—should be treated differently." *Id.* at n.3 (citing *United States v. Runyon*, 994 F.3d 192, 201–03 (4th Cir. 2021)).

The Ninth Circuit's citation to *Runyon* is arguably instructive. In *Runyon*, the Fourth Circuit looked at "conspiracy to commit murder for hire in violation of § 1958(a)[,]" as an underlying crime of violence under 18 U.S.C. § 924(c). 994 F.3d at 201-203. The court provided the elements of the entire statute,

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or *uses* or causes another

(including the intended victim) to use the mail or *any facility of interstate or foreign commerce*,

*with intent that a murder be committed* in violation of the laws of any State or the United States as consideration for the receipt of, or *as consideration for* a promise or agreement to pay, *anything of pecuniary value*,

*or who conspires to do so*,

shall be fined under this title or imprisoned for not more than ten years, or both;

*and if personal injury results*, shall be fined under this title or imprisoned for not more than twenty years, or both;

*and if death results*, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

*Id.* at 201 (quoting 18 U.S.C. § 1958(a) (emphasis and spaces between clauses added in *Runyon*). The *Runyon* court explained that "[b]ecause § 1958(a) imposes distinct enhanced penalties in circumstances where 'personal injury results' or where 'death results,' those are alternative elements for conviction that must be proven to the jury beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466 (2000)." *Id.* at 202 (modified) (citing Mathis v. United States, —— U.S. – ——, 136 S. Ct. 2243, 2256 (2016) ("If statutory alternatives carry different punishments, then under *Apprendi* they must be elements"); *see also Burrage v. United States*, 571 U.S. 204, 210 (2014) ("Because the 'death results' enhancement increased the minimum and maximum sentences to which [the defendant] was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt")).

The court further explained that "[a]s a consequence" of the enhanced penalty provisions,

United States Response to Defendant's Motion
Under 28 U.S.C. § 2255 to Vacate Sentence - 15

the multiple alternative elements of § 1958(a) define six distinct possible crimes: (1) using facilities of commerce with the intent that a murder be committed for hire; (2) conspiracy to use facilities of commerce with the intent that a murder be committed for hire; (3) using facilities of commerce with the intent that a murder be committed for hire where personal injury results; (4) conspiracy to use facilities of commerce with the intent that a murder be committed for hire where personal injury results; (5) using facilities of commerce with the intent that a murder be committed for hire where death results; and (6) conspiracy to use facilities of commerce with the intent that a murder be committed for hire where death results.

*Id.* at 202. With a divisible statute, "the modified categorical approach is necessary to determine the crime for which Runyon was convicted and which was identified as a crime of violence for his conviction under § 924(c)(1), (j)(1)." *Id.* In *Runyon*, the Fourth Circuit reviewed the indictment and jury instructions and determined Runyon conspired to commit murder for hire and death resulted and analyzing the nuances of conspiracy in the context of § 1958(a), noted that "an act that results in death obviously requires "physical force." *Id.* at 203 (citing *United States v. Irby*, 858 F.3d 231, 236 (4th Cir. 2017)). "And the death resulting from a conspiracy to commit murder for hire has the 'requisite mens rea' to constitute a use of physical force." *Id.* (citing *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019)).

At bottom, in closing the loop left open in *Linehan*, n.3, *supra,* when the government has to prove "death resulting" from murder for hire, it necessarily must prove "a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another[.]" *See* 18 U.S.C. § 373(a)).

    1.    **_Linehan_ is applicable to Counts 9 & 10 because Henrikson's solicitation to commit murder for hire of J.M. and T.S. did not result in either's death – as such, § 1958(a) _does not_ qualify as a crime of violence for purposes of § 373.**

In *Linehan*, the defendant was convicted of soliciting murder in violation of §§ 373 and 1958(a) and sentenced to a 60-month term of imprisonment because the statutory "death resulting" enhancement did not apply. *See* 18 U.S.C. § 1958(a) ("if death results, [the defendant] shall be punished by death or life imprisonment").  As such, the government did not have to prove the "death resulting" element and the appropriately conceded under those circumstances that § 1958(a) did not qualify as a crime of violence under § 373 because no force occurred. *Cf. Runyon, supra.*

In short, *Linehan* is on-point with Counts 9 and 10 because death did not result in either count noting T.S. or J.M. as the intended victim. *See* ECF No. 17, at 6-7; ECF No. 761, at 4. As such, the government concedes *Linehan* controls as to Counts 9 and 10 and, therefore, Henrikson *is actually innocent of those counts of conviction*.

> **2.    *Linehan* is _not_ applicable to Counts 7 & 8 because Henrikson's solicitation to commit murder for hire of K.C. and D.C. did result in death. Because the government had to prove the death-resulting element, § 1958(a) _does_ qualify as a crime of violence for purposes of § 373.**

Based on *Runyon, supra*, the government *does not concede*[10] that *Linehan* controls as to Counts 7 and 8. In short, both Counts 7 and 8 allege solicitation to

---

[10] This lack of concession to Counts 7 and 8 is not counter to the government's position in *Grzegorczyk* and *Linehan*. The United States recently argued in the Fourth Circuit that when  "death results," a § 1958(a) offense qualifies as a crime of violence under § 924(j) *See* Br. of Appellee, *United States v. Navarro-Cervello*, No. 22-4696 (4th Cir. (filed June 5, 2023)). In its brief, the United States expressly noted that "[t]he government did not concede in either case that a Section 1958(a) death-

commit murder for hire of K.C. (murder victim in Count 1) and D.C. (murder victim in Counts 2, 3), *see* ECF No. 17, at 5-6, and the jury was *asked to find*, and *did find*, Henrikson caused the deaths of K.C. and D.C. *See* ECF No. 761, at 3-4.

At bottom, because Henrikson has failed to show actual innocence of Counts 7 or 8, he cannot show an exception to the 1-year statute of limitations on § 2255 petitions, nor has he met the burden of showing "cause and prejudice" to overcome procedural default – because, even if he could show ineffective assistance of counsel, he cannot show prejudice on a non-meritorious issue.[11] To the extent possible, relevant to Henrikson's assertions on Counts 7 and 8, the United States respectfully submits that this Court should dismiss in part Henrikson's § 2255 motion to vacate as untimely.

> **B.    Because Henrikson's Concurrent Mandatory Life Sentences _Cannot_ Be Altered to Henrikson's Benefit, Even if this Court Vacates All of the Challenged Convictions, this Court Can Avoid the Issue and Dismiss this Matter Pursuant to the Concurrent Sentencing Doctrine.**

results offense is not a crime of violence, and the Ninth Circuit expressly reserved the question." *Id.* at 33-34 (citing *Linehan*, 56 F.4th at 707 n.4 (reserving the issue and noting *Runyon*)).

[11] Henrikson references ineffective assistance of counsel in his motion, asserting that he "finds it highly incompetent by defense counsel, at the very least, to file [sic], a notice of appeal, so that petitioner mat raise whatever arguments before the appellate court." *See* ECF No. 1043.1 at 11-12. Henrikson's statement, however, is simply conclusory and does not meet a threshold showing of deficient performance or prejudice. *See generally, Strickland v.* Washington, 466 U.S. 668 (1984). Nor does Henrikson explain how claiming ineffective assistance of counsel for not filing a notice of appeal nearly seven years after sentencing would be timely.

1    "Under the concurrent sentences doctrine, as enunciated by the Supreme

2    Court in *Benton v. Maryland*, 395 U.S. 784, 791 (1969) [(modified)], a federal

3    appellate court, as a matter of discretion, may decide that it is unnecessary to

4    consider arguments advanced by an appellant with regard to his conviction under

5    one or more counts of an indictment, if he was at the same time validly convicted

6    of other offenses under other counts and concurrent sentences were imposed."

7    *United States v. Moore*, 452 F.2d 576, 577 (9th Cir. 1971).

8        While the Ninth Circuit has rejected application of the concurrent-sentence

9    doctrine on direct appeal, *see United States v. De Bright*, 730 F.2d 1255, 1259 (9th

10   Cir. 1984) (en banc), it does not appear to have conclusively addressed it in the §

11   2255 context.[12] Other circuits have, however, affirmed its use by district courts in

12   regard to § 2255 motions.  *See e.g., Amaya v. United States,* --- F.4th ---, 2023 WL

13   4141231 (6th Cir. (June 23, 2023)) (affirming the district court's use of the

14   concurrent-sentence doctrine to decline to address the merits of the defendant's §

15   2255 claim); *Barnes v. United States*, 230 F.3d 1362 (8th Cir. 2000) (same)).

16       In this district, Senior District Judge Suko rejected the United States'

17   argument that the court could apply the concurrent sentence doctrine to dismiss a

18   defendant's *Johnson*-based § 2255 challenge to his 188-month ACCA sentence.

19   *See United States v. Beckham*, 202 F.Supp.3d 1197, 1201 (E.D.Wash. 2016). The

20   United States argued that even with the appropriate invalidation of the defendant's

21   188-month ACCA sentence, the defendant was still subject to a 188-month

22   concurrent sentence on a drug-trafficking conviction. *See Beckham*, 202 F.Supp.3d

23   at 1201. Senior District Judge Suko explained that "[o]nly the 11th Circuit has

24

25   [12] Undersigned counsel submits that in the preparation of this response, no Ninth

26   Circuit cases addressing concurrent sentencing doctrine in the § 2255 context were

27   located. Further, the other circuits addressing the issue have not appeared to cite any

28   relevant Ninth Circuit case.

extended the doctrine to the post- *Johnson* § 2255 context." *Id.* (citing *In re Williams*, 826 F.3d 1351, 1357 (11th Cir. 2016)). Further, "[t]his case is not analogous to *In re Williams*, as it is *not a case involving a mandatory life sentence* or a concurrent sentence "unrelated to" the ACCA sentence." *Id.* (emphasis added) (citing *In re Davis*, 829 F.3d 1297, 2016 WL 4070987 (11th Cir. July 21, 2016) (declining to apply *Williams* where "the judge sentenced [the Defendant] based on a single Sentencing Guidelines range for [Defendant's] ACCA violation combined with his conspiracy crime.")).

The instant matter, however, is distinguishable from *Beckham* -- as it is analogous to *Williams*.  In *Williams*, the Eleventh Circuit denied the defendant's second or successive § 2255 noting that he had "received a concurrent mandatory life [drug-trafficking] sentence on Count 1 that was unrelated to his ACCA status[,] [and] [w]e have held under the 'concurrent sentence doctrine' that, if a defendant has concurrent sentences on multiple counts of conviction and one count is found to be invalid, an appellate court need not consider the validity of the other counts unless the defendant would suffer "adverse collateral consequences from the unreviewed conviction." *Williams*, 826 F.3d at 1356 (citing *United States v. Bradley*, 644 F.3d 1213, 1293 (11th Cir. 2011)). Ultimately, the *Williams* court determined that "although Williams has made a prima facie showing under *Johnson* as to Count 3, he is unable to show that he would "benefit" from *Johnson*, since he received a concurrent mandatory life sentence on Count 1 that was unrelated to his ACCA status and is unaffected by *Johnson*." Here, while the United States concedes that Henrikson has an actionable claim on Counts 9 and 10, like *Williams*, Henrikson cannot show that he would benefit from *Linehan*, since the five-year sentences he received on Counts 9 and 10, are concurrent to two, consecutive mandatory life terms.

1   Most recently, the Sixth Circuit applied the concurrent sentence doctrine

2   under circumstances very similar to *Williams* and this case.  *See Amaya v. United*

3   *States,* --- F.4th ---, 2023 WL 4141231 (6th Cir. (June 23, 2023)). In *Amaya*, the

4   defendant was sentenced to three concurrent life sentences, including a mandatory

5   life sentence from a § 1958(a) conviction. *See Amaya*, --- F.4th ---, 2023 WL

6   4141231 at *1. "Years later, Amaya filed a pro se motion under 28 U.S.C. § 2255

7   to vacate his conviction and sentence on count two [a § 924(c), (j) conviction],

8   arguing that after *United States v. Davis*, ―― U.S. ――, 139 S. Ct. 2319, 204

9   L.Ed.2d 757 (2019), his murder conspiracy charge was no longer a valid predicate

10  crime of violence for his § 924(c) conviction [(footnote omitted)]." *Id.* Due to the

11  fact that Amaya only challenged one life sentence and would remain subject to the

12  two other life sentences, including a mandatory on the § 1958(a) conviction, "[t]he

13  district court invoked the 'concurrent sentence doctrine' and denied relief without

14  reaching the merits." *Id.*

15      On appeal, the Sixth Circuit affirmed and explained,

16      Amaya challenges his conviction pursuant to 28 U.S.C. § 2255. That
17      statute limits its reach to "prisoner[s] *in custody* under sentence of a
        court established by Act of Congress *claiming the right to be released*
18      ...." *Id.* § 2255(a) (emphasis added). So, unless Amaya is "claiming the
        right to be released" from "custody," we cannot grant him relief. *See*
19      *United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995) ("The plain
        language of § 2255 provides only prisoners who claim a right to be
20      released from custody an avenue to challenge their sentences.").
21

22  *Id.* (emphasis and ellipsis in *Amaya*).  The Sixth Circuit further explained:

23      The Supreme Court has explained that a petitioner is "in custody" when
        he is subject to conditions that "significantly restrain [the] petitioner's
24      liberty to do those things which in this country free men are entitled to
        do." *Jones v. Cunningham*, 371 U.S. 236, 238, 243 (1963); *see*
25      *Hautzenroeder v. DeWine*, 887 F.3d 737, 740 (6th Cir. 2018) (applying
26      the same definition). A prison term is obviously such a restraint. So
        Amaya's petition would plainly fall within the statute if vacating his  §
27      924(c) conviction could affect the length of his prison term. But Amaya
28

United States Response to Defendant's Motion
 Under 28 U.S.C. § 2255 to Vacate Sentence - 21

is serving three concurrent life sentences; he challenges only one of them. *Were we to vacate the one conviction he contests, he would still be in prison for the rest of his life.*

*Id.* at *2 (emphasis added).

Amaya argued that like *Ray v. United States,* 481 U.S. 736 (1987) (per curium), he was subject to a mandatory special penalty assessment and application of the concurrent sentence doctrine deprived him of $100 he owned on the challenged conviction. *See id.* The Sixth Circuit disagreed, stating that "the plain terms of § 2255 tell us that we may not use the statute to correct errors that cannot affect a petitioner's 'release[ ] from custody.'" *Watroba*, 56 F.3d at 29. "And '[a] monetary fine is not a sufficient restraint on liberty to meet the 'in custody' requirement for § 2255 purposes.'" *Id.* (citation omitted in *Amaya*). The Sixth Circuit noted that in *Ray*, the Supreme Court held it was error to apply the concurrent sentence doctrine on direct appeal "[b]ecause a ruling in Ray's favor would have relieved him of the obligation to pay the $50 special assessment attached to the challenged count," as such, "the Court determined that the sentences were not 'in fact ... concurrent,' so the doctrine did not apply." *Id.* (citing *Ray,* 481 U.S. at 737). Further, "*Ray* is understood to have abolished the concurrent sentence doctrine for direct review of federal convictions." *Id.* (citing *Al-'Owhali v. United States*, 36 F.4th 461, 466 (2d Cir. 2022) (internal quotation marks and citation omitted); *see United States v. Wade*, 266 F.3d 574, 579 (6th Cir. 2001) (applying *Ray* on direct appeal); *United States v. Ware*, 282 F.3d 902, 906 (6th Cir. 2002) (same).

The Sixth Circuit noted that

Amaya's case does not come to us on direct review. He seeks relief under the federal habeas statute, 28 U.S.C. § 2255. And it has "long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio*, 442 U.S. 178, 184 (1979). To attack a final

> judgment through a § 2255 petition, Amaya must "claim[ ] the right to
> be released" from "custody." 28 U.S.C. § 2255(a). The $100 special
> assessment does not fit the bill, so Amaya is not entitled to relief.

*Id.* at *3 (internal citation modified). Ultimately, the Sixth Circuit affirmed the district court's application of the concurrent sentence doctrine to dismiss Amaya's § 2255 motion without addressing the merits. *Id.*

This matter is on all fours with *Amaya.* Henrikson does not request release from custody. Nor does he show how vacating Counts 7-10, would in any way have a practical affect on his sentence – as Counts 7-10 were all imposed to be served concurrent to his two consecutive, mandatory life sentences. *See* ECF No. 863, at 4.

Here, Henrikson was sentenced to two mandatory life terms, to be served consecutively. *See id.*  As in *Amaya*, this Court could vacate <u>all four</u> of Henrikson's solicitation convictions (notwithstanding the government's objection to vacating Counts 7 and 8) and *he would still be in prison for the rest of his life* – times two.  This Court *could* certainly re-evaluate the sentencing bundle and apply different terms in relation to Counts 4-11, but the end result would be the same, *mandatory life*. In short, the United States respectfully submits that this is exactly the type of case in which the principles behind the concurrent sentencing doctrine – i.e., judicial economy and finality, are best served.

### C.   Alternatively, if this Court Declines to Apply the Concurrent Sentence Doctrine and Vacates Counts 9 & 10, the Court Can Simply Amend the Judgment Without Unbundling and Re-Sentencing.

In *Troiano v. United States*, the Ninth Circuit considered an appeal from a "partially successful motion for relief under 28 U.S.C. § 2255[,]" where the defendant "contend[ed] the [district] court was required to conduct a full resentencing proceeding on all counts because removing the [ACCA] sentencing

enhancement from one count necessarily impacted the court's consideration of his full sentencing package."  918 F.3d 1082, 1084 (9th Cir. 2019). The Ninth Circuit concluded that "[t]he district court did not abuse its discretion when it declined to conduct a full resentencing and instead corrected Troiano's sentence only as to the count of conviction affected by *Johnson*."  *Id.* at 1086. In short, the defendant argued that because the sentences on multiple counts of conviction were grouped "to fashion a sentencing package" that the "so-called 'sentencing package doctrine' requires that he be resentenced on all four counts." *Id.*

The Ninth Circuit explained that "[e]ven were we to conclude that the counts were grouped for sentencing—something the record does not reflect here—the decision to restructure a defendant's entire sentence when only one of the counts of conviction is found to be invalid is discretionary and not, as Troiano suggests, mandatory." *Id.* at 1086-1087. Ultimately, the court noted that the record showed that "Troiano's counts of conviction were not actually grouped for sentencing in any material way that might have led the district court, in its discretion, to unbundle them for resentencing." *Id.* at 1087.  As such, "[t]he district court did not abuse its discretion by correcting Troiano's sentence only as to the affected count of his multi-count conviction." *Id.*

Here, Henrikson's similar convictions were grouped, *see* PSIR ¶¶ 243-278, and a multiple count adjustment was applied, *see id.,* at ¶¶ 279-281, resulting in a combined offense level of 53, *see id.,* at ¶ 282, and the highest final offense level possible of 43. *See id.,* at ¶ 285. However, notwithstanding the advisory guideline range was life, *see id.,* at ¶ 410, the district court had no discretion but to sentence Henrikson to a life term on Count 1, 2, and 3.  *See* 18 U.S.C. § 1958(a); *see also* PSIR ¶¶ 413-414. At bottom, like *Troiano*, Henrikson's counts of conviction "were not grouped in any material way" that would lead to unbundle and then re-bundle the same package – or, even if the Court exercised its discretion to impose different

sentences on all counts except counts 1-3, there would be no practical effect on Henrikson's custody status.

**III.    CONCLUSION**

Based on the above, the United States respectfully requests this Court to: (1) dismiss Henrikson's § 2255 motion in part upon finding Counts 7 and 8 are not controlled by *Linehan* and, thus, his habeas motion is untimely and not excused by cause and prejudice; (2) exercise its discretion to dismiss Henrikson's § 2255 motion in full upon application of the concurrent sentence doctrine; or (3) if this Court is inclined to grant Henrikson's § 2255 motion in part upon finding Counts 9 // and 10 are controlled by *Linehan*, then simply amend the existing judgment rather than unbundle and resentence him to the same mandatory life terms.

Dated:  June 30, 2023.

Vanessa R. Waldref
United States Attorney

*s/ Russell E. Smoot*
Russell E. Smoot
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2023, I placed in the U.S. Mail the foregoing which will send notification of such filing to the following:

James Terry Henrikson # 13004-059
United States Penitentiary – Atwater
P.O. Box 019001
Atwater, CA 95301-019001

*s/ Russell E. Smoot*
Russell E. Smoot
Assistant United States Attorney